Foster, J.
Claimants Pickman appeal from an order of the Appellate Division, Second Department, which modified an award in condemnation, as fixed by the Supreme Court at Special Term by increasing the same from $710,310 to $750,000. The trial court wrote no opinion, and neither did the Appellate Division except to say: “ The awards were lower than any of the appraisals in the record. Upon all of the circumstances, we are of the opinion that the fair value of the land taken should be fixed as above specified (Matter of City of New York [A. & W. Realty Corp.], 1 N Y 2d 428; Matter of City of New York [Titus St.], 139 App. Div. 238) ” (9 A D 2d 949). The case cited from this court is authority for the proposition that a trier of the facts in a case of this kind is limited to a judicial consideration of the evidence, and may not act on his individual opinion in disregard of the evidence presented. In the present case there was no opinion evidence of .value lower than. $750,000.
The property taken embraces 829,185 square feet of land (approximately 19 acres), and was part of an original tract comprising 132 acres, known as the Oakland Golf Course. This golf course was located in a residential area in Bay side, Long Island, on the north side of the Horace Harding Expressway between Springfield and East Hampton Boulevards. The community thereabouts consisted of one-family houses, garden-type apartments and apartment houses. On the southerly side of the ExpressAvay, opposite the parcel taken, there are about 60 stores, which include a post office, banks and supermarkets. Busses stop on the Expressway directly in front of the property and run to the subway.
*442 Apparently the land taken is close to level with the surrounding streets, except for a small rise in the westerly part thereof. Claimants assert, and it does not seem to be denied, that the nature of the topography made possible the planned construction of higher buildings without increasing their area coverage, as permitted by zoning regulations. Thus four six-story buildings and six seven-story buildings could be constructed on the land taken. The entire golf course was zoned residential F and FI, but the land taken is entirely within the F zone. There is no dispute over the fact that F zone is more suitable for the erection of apartment houses.
Title to the premises vested partly on October 15, 1957, and partly on November 26, 1957, and the proceedings were consolidated for trial. The entire golf course was purchased by claimants’ assignor on March 4, 1953 for $2,388,000, or a land unit value of 40% cents per square foot. At the time title to the land taken vested in the city, the whole golf course was vacant, unsubdivided and unimproved.
The trial court’s award for the property taken, 829,185 square feet at $710,310, indicates a value of approximately 85 cents a square foot, and the Appellate Division award at $750,000 indicates a value of 89.8 cents a square foot. This would indicate a total value of $744,608, but Keely, the city’s appraiser, rounded it off to $750,000, and such was the value adopted by the Appellate Division. Claimants’ appraiser valued the premises at a unit value of $2 a square foot, or a total value of $1,658,500. Such a vast spread between the conflicting figures of experts is not uncommon in cases of this character, but it is somewhat unique for a trial court to fix a lower value than that expressed by any appraiser, and for an appellate court to take without qualification the value opined by the appraiser for the condemnor.
Claimants urge that the circumstances mentioned raise a question as to whether due consideration was given to the evidence, and also whether the decision of the Appellate Division is supported by substantial evidence. Ordinarily the opinion of an expert, supported by actual sales, is regarded as substantial evidence (People ex rel. MacCracken v. Miller, 291 N. Y. 55), but this general rule does not apply if the expert ignored ele *443 ments of value which should be considered. Claimants argue specifically that the city’s appraiser and the Appellate Division disregarded the difference in value between property in zone F and property in zone FI.
There is some hearsay evidence in the record that at the time of the trial, or just before, claimants sold the remainder of the tract for $40,000 an acre. On such a basis the 19-acre parcel taken would be worth about $760,000 (19 x $40,000). This figure is remarkably close to the figure of $750,000 as found by the Appellate Division. Since the latter court wrote nothing beyond the brief memorandum quoted, it would be mere surmise, of course, to assume that it was influenced by this sale of the remainder, and we cannot find from the record that the city’s expert took it into account. Eeal evidence of a bona fide sale of the remainder of the tract would probably have been valuable, for if the remainder brought $40,000 an acre this would have been a rather clear indication that the subject parcel was worth more per acre for it was entirely in the more favorable F zone while most of the remainder was in the less favorable FI zone.
Claimants also complain that Keely, the appraiser for the city, whose valuation was ultimately accepted, failed to give the property taken the benefit of up trends in values comparable to what he had expressed with relation to other nearby properties. A comparison was made between the property taken and the Bayside Golf Course owned by one Jack Parker, a part of which was also taken. Parker’s claim was also involved in this proceeding but was subsequently settled. In 1955 Keely appraised a part of the Oakland Golf Course, taken for the Horace Harding Expressway, which was in the F zone, a part of which is the subject of this proceeding, at 75 cents a square foot. Two and a half years later, in October, 1957, in connection with this proceeding his appraisal was 90 cents a square foot, a 20% increase. He appraised the Bayside Golf Course, which was purchased by Parker less than a year before the trial of this proceeding for 71 cents a square foot, at 85 cents a square foot, or a 20% increase also. Thus he gave an upward trend, or increase, of 20% for the Parker property, held less than a year, as against a similar increase for the claimants’ property held two and a half years. This fact alone would not indicate an *444 erroneous method of appraisal but Keely’s explanation raises serious doubts we think. It is found in portions of his testimony which on account of their succinctness are quoted here:
“ Q. Well, how do you distinguish the fact that in one particular case after two and a half years you only gave it a 15^ increase and here after a sale of only one year you came up with the same figure ? A. * * * In the Bayside Golf Course, on the date of vesting, some one year after its purchase by Parker, Parker immediately—within two weeks of the date of his closing of title from Cord-Meyer—was physically on the tract with his steam shovels and started development. Mr. Pickman had the Oakland Golf Course, which is, as to the part taken herein, as suitable for apartment house development. While he has owned it since some 5 years, at the date of vesting had not yet started to develop an inch of the holding, and that tells me something in valuation. That there certainly was a retarding influence in value on land suitable for apartment developments to the extent that the Oakland Golf Course is, and this retarding feature was caused, as I said before, by the inability to finance in the market around the date of vesting a ten to fifteen million dollar operation that toas proper here.
# * *
‘ ‘ I observed that where people did buy land that was suitable for apartment house development in this area, they didn’t build on it either during this time. It’s a reflection of a very hard money period from all through ’56 and ’57, when you couldn’t finance this type of operation.
* # %
‘11 valued the Bayside Golf Course on the date of vesting, having in mind not only its purchase by Parker a year before, but I reflected all the elements that pertained to the valuation. I found that it was not suitable for apartment houses but for one family houses. I found that right after the sale Parker moved in and did the job. I found that in the Oakland Golf Course Mr. Pickman didn’t think enough of the availability of financing to do the same, so that he would have to sit with the land as he has with it for the past 5 years before vesting: I studied the Levitt tract, which is comparable as to use ’ ’ (emphasis supplied).
*445 The foregoing would seem to indicate that Keely reduced his appraisal of the subject property, in part at least, because claimants did not, on account of financial inability, immediately commence the construction of apartment houses on the subject property after they became vested with title. This was a dubious rationale for the purpose of appraisal. Claimants were entitled to the value of the property based on the best use that could be made of it. The fact that they did not put the property to the best use for which it was available because of a temporary stringency in the money market, or their own financial inability, should not deprive them of the fair potential value of the property (4 Nichols, Eminent Domain [3d ed.], § 12.3112, subd. [1], par. A, pp. 64-65). Since the Appellate Division accepted Keely’s appraisal we must assume that it also accepted his method of arriving at the same. Appraisal evidence arrived at through the application of erroneous principles is unsubstantial as a matter of law, even though it may appear substantial on its face.
Claimants’ assignor purchased the entire tract from which the subject parcel was carved in March, 1953, at 40% cents per square foot. Four and a half years later they were awarded a sum which figures out at approximately 89.8 cents a square foot, or an increment in value over the purchase price of 120%. The city regards this as the outstanding element of valuation, and while it does seem impressive it is not necessarily decisive. The purchase price embraced the entire tract and the figures given must be regarded as the mean, or average price per square foot. It should not be taken to demonstrate conclusively that the land taken is of the same square foot value as the remainder of the tract, for the land taken was in the more favored F zone while the remainder of the tract was in the less favored FI zone. Thus, the 120% increment in value is not a reliable barometer upon which to rest a pro forma affirmance of the Appellate Division.
The city also points out that the assessed valuation of the land taken was $216,092, and the Appellate Division award is almost three and one-half times that amount, but it neglects to say that this figure of assessed valuation is prorated from the assessment of the whole tract of 132 acres. Hence, as a criterion for value it is subject to the same infirmity dwelt upon in the *446 preceding paragraph. Moreover, there is proof in the record that the Borough of Queens, where the property is located, is one of the fastest growing boroughs in the city and values are probably changing with a rapidity commensurate with its growth.
As far as we can tell from the record, the parcel taken was unique, and there was no really comparable property available at the time title vested in the city. Nevertheless, sales of other properties were received in evidence. The city’s Exhibit 32 lists some 20 sales, while the claimants list 90 sales.
Obviously, many of these sales could not have a very cogent probative force in solving the problem of value presented here, and it is still more obvious that a reviewing court, unfamiliar with the terrain, cannot possibly evaluate them with even a semblance of accuracy. We, therefore, think it fruitless to discuss them, and the Appellate Division made no mention of them. However, in our opinion the order of the Appellate Division should be reversed for the following reasons: (1) the record supports the inference that the Appellate Division failed to give adequate consideration to the difference in value between land in F and FI zones where the subject property is situated; (2) the city’s expert, and the Appellate Division which relied upon his opinion, did not give full consideration to the subject property’s potential value because it was not developed due to financial reasons.
The order should be reversed, with costs to the claimants Pickman in this court, and the matter remitted to Special Term for further proceedings not inconsistent with this opinion.
Chief Judge Desmond and Judges Ftjld, Froessel and Van Voorhis concur with Judge Foster; Judges Dye and Burke dissent and vote to affirm.
Order reversed, etc.